UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SAMAN ESHAGHPOUR,

Petitioner,

v.

PAMELA BONDI, *et al.*,

Respondents.

Case No. C25-2322-SKV

ORDER GRANTING PETITON FOR WRIT OF HABEAS CORPUS

## I. INTRODUCTION

Petitioner Saman Eshaghpour is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. He has filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 seeking release from custody. Dkt. 1. Petitioner, who is proceeding through counsel, asserts that he is entitled to release from custody because removal to his former country of residence, Iran, is not reasonably foreseeable and his continued detention is therefore in violation of *Zadvydas v. Davis*, 533 U.S. 678 (2001). *See id*. at 4. Petitioner asserts additional claims related to his detention and potential removal as well. *See id.* at 22-26. Respondents have filed a return to the petition (Dkt. 10), and Petitioner has filed a reply to the return (Dkt. 14). This matter is now ripe for review.

The Court, having considered the parties' submissions and the governing law, GRANTS Petitioner's petition for writ of habeas corpus, and ORDERS that Petitioner be immediately released from detention on reasonable conditions of supervision. As discussed below, the Court also GRANTS Petitioner's requests for relief on his claims related to third-country removal.

## II.  BACKGROUND

Petitioner is a native and citizen of Iran. *See* Dkt. 1 at 5-7; Declaration of Javier Delgado (Delgado Decl.), Dkt. 11, ¶ 3. Petitioner was admitted to the United States on May 14, 2001, as a refugee. *See* Delgado Decl., ¶ 4. On November 21, 2008, Petitioner's status was adjusted to that of a lawful permanent resident, retroactive to May 14, 2001. *Id.*, ¶ 5.

In May 2003, Petitioner was convicted in Multnomah County, Oregon of felony assault in the fourth degree and was sentenced to 36 months' probation. Delgado Decl., ¶ 6. Petitioner's probation was revoked in April 2004, and he was sentenced to six months in jail. *Id.* In February 2012, Petitioner was charged in Washington County, Oregon with two counts of sexual abuse in the first degree by means of forcible compulsion. *Id.* Petitioner was convicted in June 2012 of the lesser included offense of two counts of attempted sexual abuse in the first degree, and he was sentenced to a term of 36 months imprisonment. *Id.*

At some point thereafter, presumably upon Petitioner's completion of his state court sentence, the Department of Homeland Security ("DHS") issued a Notice to Appear ("NTA"), charging Petitioner as removable pursuant to § 237(a)(2) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2), for having been convicted of an aggravated felony. *See* Delgado Decl., ¶ 7. On September 11, 2014, an immigration judge ordered that Petitioner be removed to Iran, and that order is administratively final. *See id.*; *see also* Dkt. 1 at 7. On or about December 11, 2014, Petitioner was released on an Order of Supervision ("OSUP") because ICE was unable

to obtain travel documents to Iran or to any third country at that time. Delgado Decl., ¶ 8. Petitioner was required to check-in regularly with ICE beginning in January or February 2015, and he remained on release until July 9, 2025, when he was taken into custody upon arriving at the Portland ICE facility for an in-person check-in. *See* Dkt. 1 at 3-4, 7.

Petitioner maintains that he was told he was arrested because the United States had recently bombed Iran. Dkt. 1 at 7. ICE Deportation Officer Javier Delgado, in a declaration submitted in support of Respondents' return, avers that Petitioner's OSUP was revoked, and he was arrested, because ICE Enforcement and Removal Operations ("ERO") had determined there was now a significant likelihood of Petitioner's removal in the foreseeable future to either Iran or a third country. Delgado Decl., ¶ 9. Officer Delgado offers no explanation as to how this determination was made or the basis for it.

On July 11, 2025, removal documents were prepared in order to seek a travel document for Petitioner from Iran. *See* Delgado Decl., ¶ 10; *see also* Dkt. 10 at 3. On November 1, 2025, ICE followed up on its earlier travel document request because it had yet to receive a response to that request. Delgado Decl., ¶ 11. ICE has apparently received no response to its follow-up inquiry either. *See id.*

Petitioner initiated the instant action on November 19, 2025. Petitioner argues in his federal habeas petition that: (1) his continued detention violates the Due Process Clause of the Fifth Amendment because there is no significant likelihood that he will be removed in the reasonably foreseeable future; (2) his arrest and re-detention violated his procedural and substantive due process rights; (3) any attempt to carry out his removal to a third country requires notice and a meaningful opportunity to be heard in reopened removal proceedings, as mandated by statute and the Constitution; and (4) Respondents' recently implemented third-

country removal program is punitive in nature and execution and is therefore unconstitutional under the Fifth and Eighth Amendments, as explained in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896). *See* Dkt. 1 at 22-26.

Respondents, in their return, argue that: (1) this Court lacks jurisdiction to enjoin Petitioner's re-detention and removal; (2) Petitioner's detention is not indefinite; and (3) this Court should decline to exercise jurisdiction over Petitioner's third country removal claims because he is likely a member of the non-opt out certified class in *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-cv-10676-BEM (D. Mass. Mar. 23, 2025).

## III. DISCUSSION

### A. Indefinite Detention

Title 8 U.S.C. § 1231 governs the detention and release of noncitizens such as Petitioner who have been ordered removed. Under § 1231(a), the Department of Homeland Security ("DHS") is required to detain a noncitizen during the 90-day "removal period." 8 U.S.C. §§ 1231(a)(1)(B), (a)(2). After the removal period expires, DHS has the discretionary authority to continue to detain certain noncitizens, including those who are removable under § 1227(a)(2), or to release them on supervision. 8 U.S.C. § 1231(a)(6). Although § 1231(a)(6) authorizes ICE to detain noncitizens beyond the initial 90-day window, it cannot do so indefinitely. *See Zadvydas*, 533 U.S. at 682.

In *Zadvydas*, the Supreme Court held that § 1231(a)(6) implicitly limits a noncitizen's detention to a period reasonably necessary to bring about that individual's removal from the United States. *Zadvydas*, 533 U.S. at 701. The Supreme Court determined that it is "presumptively reasonable" for DHS to detain a noncitizen for six months following entry of a final removal order while it works to remove the individual from the United States. *Id.* "After

this 6-month period, once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id*. If the Government fails to rebut the noncitizen's showing, the noncitizen is entitled to habeas relief. *Id*. The Supreme Court explained in *Zadvydas* that "for detention to remain reasonable, as the period of prior post removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

Respondents acknowledge in their briefing that the presumptively reasonable six-month period has expired. And, indeed, the record confirms that the total length of Petitioner's detention at this point exceeds six months. Petitioner's final order of removal was issued on September 11, 2014, and he was released on supervision 91 days later, on or about December 11, 2014, because ICE was unable to obtain travel documents to Iran or a third country. *See* Delgado Decl., ¶ 7, 8. Petitioner was re-detained on July 9, 2025, and has remained in detention since that time, a period which by itself now stands at approximately six months.[1] Thus, the record makes clear that Petitioner's ongoing detention is not presumptively reasonable under *Zadvydas*.

The record also supports Petitioner's assertion that there is no significant likelihood of his removal in the reasonably foreseeable future. Petitioner was released on an OSUP over a decade ago because ICE was unable to obtain travel documents for him following issuance of his final removal order. Nothing in the record speaks to whether ICE made any effort to remove

---

[1] Even if Petitioner's most recent period of detention had not reached the six-month mark, "[a] petitioner's total length of confinement need not be consecutive to reach the six-month presumptively reasonable limit established in *Zadvydas*." *Tang v. Bondi*, No. C25-1473-RAJ-TLF, 2025 WL 2637750, at *4 (W.D. Wash. Sept. 11, 2025) (citing *Nguyen v. Scott*, 796 F. Supp. 3d 703, 721-22 (W.D. Wash. 2025).) Thus, Petitioner total length of detention far exceeds six months.

Petitioner in the years following his December 2014 release from custody. Since July 2025, when Petitioner was returned to custody, ICE has once again attempted to obtain travel documents for Petitioner without any success. Indeed, it is not clear if ICE has had any direct communication with Iranian authorities over the past six months regarding its attempt to obtain travel documents for Petitioner.

Petitioner has also presented to the Court in support of his *Zadvydas* claim a document prepared by ICE in November 2024, which shows that at that time ICE considered Iran an "uncooperative" country which does not facilitate the return of its citizens. *See* Dkt. 1, Ex. 1. Nothing in the record suggests that ICE's classification of Iran as an uncooperative country has changed in the past year and, indeed, the apparent absence of any response from Iran regarding ICE's request for travel documents suggests that Iran remains uncooperative in facilitating the return of its citizens.

Respondents argue in their return that there is a significant likelihood of Petitioner's removal in the reasonably foreseeable future. Dkt. 10 at 7-8. However, this argument rests solely on the averments in Officer Delgado's declaration that a travel document request was submitted to Iran in July 2025, that ICE followed up on the request in November 2025, and that no response has been received to either the initial request or the follow-up inquiry. *See id.* at 8; Delgado Decl., ¶¶ 10, 11. Respondents do not explain how these two apparently unsuccessful attempts to communicate with Iranian authorities regarding Petitioner's removal demonstrate *any* likelihood, much less a significant one, that Petitioner will be removed to Iran in the reasonably foreseeable future.

Respondents also indicate in their return that ICE *may* pursue removal to a third country if Iran does not issue a travel document, though they offer no specific details regarding this

possibility. Dkt. 10 at 8. The vague suggestion that ICE might pursue removal to an unspecified third country at some future time does nothing to demonstrate that there is a significant likelihood of removal in the reasonably foreseeable future.

"Courts in this circuit have regularly refused to find Respondents' burden met where Respondents have offered little more than generalizations regarding the likelihood that removal will occur." *Nguyen*, 796 F. Supp. 3d at 725 (citations omitted). Officer Delgado's extremely vague declaration is insufficient to satisfy Respondent's burden under *Zadvydas*. Petitioner is therefore entitled to habeas relief with respect to his indefinite detention claim.[2]

**B. Third Country Removal**

Petitioner asserts in his Petition two claims relating to his possible removal to a third country, a possibility that Respondents have suggested but not elaborated on, both challenging the constitutionality of ICE's current third-country removal policy. *See* Dkt. 1 at 15-22, 24-26. Petitioner requests in relation to these claims that this Court: (1) Order that Respondents may not seek to remove him to a third country "without notice and [a] meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings"; and (2) Order that Respondents may not remove him to any third country "because Respondents' third-country removal program seeks to impose unconstitutional punishment on its subjects, including imprisonment and other forms of harm." Dkt. 1 at 27.

//

//

[2] Petitioner also argues in his Petition that his re-detention violated his procedural and substantive due process rights. *See* Dkt. 1 at 23-24. However, because the Court has determined that Petitioner is entitled to release from confinement on the basis of his *Zadvydas* claim, the Court need not address Petitioner's due process claims pertaining to his re-detention.


*1. Ability to Seek Relief*

Respondents argue in their return that the Court should reject Petitioner's requests for relief relating to his third country removal claims "because he is likely a member of the plaintiff class in *D.V.D. v. Dep't Homeland Sec.*, Civ. A. No. 25-10676 (D. Mass.)." Dkt. 10 at 8. Respondents contend that

> The plaintiff class in *D.V.D.* sought and received an injunction barring ICE from removing members of the class to third countries. That injunction was stayed by two orders of the Supreme Court. Petitioner cannot end-run the Supreme Court's stay of an injunction barring his removal to a third country by seeking the same relief in a different court.
>
> . . . Simply put, Petitioner is not entitled to another bite at the apple before this Court to obtain relief that has already been stayed by the Supreme Court.

*Id.*

Respondents have made this same argument in a number of prior cases, and courts in this district have consistently rejected the argument. *See Nguyen v. Scott*, 796 F. Supp. 3d 703, 729-32 (W.D. Wash. Aug. 21, 2025); *Baltodano v. Bondi*, No. C25-1958-RSL, 2025 WL 3484769, at *2-3 (W.D. Wash. Dec. 4, 2025); *Abubaka v. Bondi*, No. C25-1889-RSL, 2025 WL 3204369, at *2 (W. D. Wash. Nov. 17, 2025). This Court, as did the court in both *Baltodano* and *Abubaka*, adopts the *Nguyen* court's analysis of this issue and its findings that (1) "The class certification order in *D.V.D.* does not prevent this Court from adjudicating Petitioner's claims regarding third-country removal," and (2) absent "clear guidance from the Supreme Court," which the emergency docket order in *D.V.D.* does not provide, this Court must follow well-established precedent. *Nguyen*, 796 F. Supp. 3d at 729-32.

//

//

        *2. Due Process/INA*

Petitioner argues that prior to any third-country removal, he must be afforded notice and a meaningful opportunity to be heard, and he asserts that ICE's current third-country removal policy violates due process and relevant statutes and regulation because

> [I]t directs ICE agents to remove individuals to third countries without any notice or process *at all* where diplomatic assurances are received and, where not diplomatic assurances are received, to provide flagrantly insufficient notice (6-24 hours) and opportunity to respond. . . .

Dkt. 1 at 24-25 (emphasis in original). Respondents offer no substantive argument to this claim, arguing only that the Court should decline to exercise jurisdiction over the claim. As the Court has rejected that argument, it will now consider Petitioner's due process challenge to ICE's current removal policy.

A number of courts in this district have recently addressed challenges to ICE's current third-country removal policy and have concluded that the policy violates due process.[3] *See Baltodano*, 2025 WL 3484769, at *6; *Abubaka*, 2025 WL 3204369, at *6; *see also Nguyen*, 796 F.3d at 727-29. In reaching these conclusions, the courts have relied on an earlier decision from this district, *Aden v. Nielsen*, 409 F. Supp. 3d 998 (W.D. Wash. 2019).

In *Aden*, the court held that a "noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden*, 409 F. Supp. 3d at 1009. Citing to both the due process requirement that a petitioner be afforded "a full and fair hearing, an impartial decisionmaker, and evaluation of the merits of his or her particular claim," and to the statutory requirements of 8 U.S.C. § 1231, the *Aden* court held that in the context of a third-

[3] The current policy has not been provided to the Court in this action, but it is set forth in the *Nguyen* court's opinion. *See Nguyen*, 796 F. Supp. 3d at 728.

country removal, "[g]iving petitioner an opportunity to file a motion to reopen [his removal proceedings] . . . is not an adequate substitute for the process that is due in these circumstances." *Id.* at 1010 (citations omitted). Rather, the court concluded, the removal proceedings must be reopened so that a hearing may be held. *Id.* at 1011. In *Nguyen*, the court noted that "[t]he requirements set forth in *Aden* flow directly from binding Ninth Circuit precedent about due process protections before removal to a third country[,]" and held that the ICE's current policy governing third-country removals "contravenes Ninth Circuit law."

The Court finds no basis to deviate from the courts' reasoning in *Baltodano*, *Abukaka*, and *Nguyen*, and applies the same reasoning here. The Court therefore concludes that Petitioner is entitled to the requested order that Respondents not remove him to a third country without notice and a meaningful opportunity to be heard in reopened removal proceedings.

*3. Punitive Nature of Removal Policy*

Petitioner also argues that Respondents' current third-county removal policy is punitive in nature and execution and is therefore unconstitutional under *Wong Wing v. United States*, 163 U.S. 228 (1896). *See* Dkt. 1 at 21-22, 25-26. Petitioner asserts that "the government has arranged for third countries to receive deportees and imprison them on arrival," that it has "selected countries notorious for human rights abuses and instability for third-country removal arrangements," and that it has "targeted individuals with criminal convictions for third-country removal where they will be imprisoned and harmed." *Id.* at 26. Respondents have not provided any substantive response to this claim.

However, as with the above discussed due process challenge to the current third-party removal policy, courts in this district have recently addressed claims that the government's third-country removal policy is punitive and therefore unconstitutional under *Wong Wing*. *See*

*Baltodano*, 2025 WL 3484769, at *7-10; *Abubaka*, 2025 WL 3204369, at *7-8; *Nguyen*, 796 F.3d at 733-35.

In *Nguyen*, the court took judicial notice of "statements made by government officials, both on social media and to the press, acknowledging that deportees to third countries are being imprisoned and expressing intent to continue that practice[,]" and found that:

> [T]hese statements . . . do offer evidence that third country deportation is occurring as a punishment. *See, e.g.*, Dkt. 25 at 13 (official video of President Donald J. Trump stating "[I]f illegal aliens choose to remain in America, they're remaining illegally and they will face severe consequences. Illegal aliens who stay in America face punishments, including significant jail time, enormous financial penalties, confiscation of all property, garnishment of all wages, imprisonment and incarceration, and sudden deportation in a place and manner solely of our discretion."); *see also id.* (statement by President Donald J. Trump that immigrants would be detained at Guantanamo Bay prison because "it's a tough place to get out" and "we don't want them coming back.").

*See Baltodano*, 2025 WL 3484769, at 8 (quoting *Nguyen*, 796 F. Supp. 3d at 733-34). The *Nguyen* court also noted that "[o]ther courts across the country have recognized that the government is intentionally removing individuals to countries where they will be imprisoned." *Nguyen*, 796 F. Supp. 3d at 734 (citations omitted).

The court in *Baltodano* and *Abukaka*, relying heavily on the *Nguyen* court's analysis, concluded that Respondents' "practice of third-country removal paired with imprisonment is intended to be punitive and thus violates due process under *Wong Wing*, 163 U.S. 228 at 236-38 (1896), and *Zadvydas*, 533 U.S. 678 at 693-94 (2001)." *Baltodano*, 2025 WL 3484769, at *10; *Abubaka*, 2025 WL 3204369, at *8; *see also Nguyen*, 796 F.3d at 733-35; *Hambarsonpour v. Bondi*, C25-1802-RSM, 2025 WL 3251155 (W.D. Wash. 2025).

Respondents offer no reason why this Court should deviate from the decisions referenced above, and this Court perceives none. Accordingly, this Court similarly concludes that

Respondents' current practice of third country removals paired with imprisonment violates due process. Petitioner is therefore entitled to an order enjoining Respondent from removing Petitioner to any third country where he is likely to face imprisonment or harm.

## IV. CONCLUSION

Based on the foregoing, this Court ORDERS as follows:

(1) Petitioner's petition for writ of habeas corpus (Dkt. 1) is GRANTED.

(2) Respondents shall immediately RELEASE Petitioner on conditions of supervision consistent with those governing Petitioner's release prior to his recent re-detention. Respondents shall concurrently file with the Court a notice confirming Petitioner has been released from immigration detention.

(3) Respondents are ENJOINED from removing or seeking to remove Petitioner to a third country without providing him notice and a meaningful opportunity to respond in a reopened removal proceeding before an immigration judge.

(4) Respondents are ENJOINED from removing or seeking to remove Petitioner to any third country where he is likely to face imprisonment or harm.

(5) Any fee petition shall be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

DATED this 14th day of January, 2026.

S. KATE VAUGHAN
United States Magistrate Judge